IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

**PET FOOD INSTITUTE,**
**NEW MEXICO CHAMBER OF COMMERCE,**
**NEW MEXICO FARM & LIVESTOCK BUREAU,**
**PET UNDUSTRY JOINT ADVISORY COUNCIL,**
**And RIO GRANDE KENNEL CLUB,**

      **Plaintiffs,**

v.   No. Civ. 21-00048-JCH-SCY

**MICHELLE LUJAN GRISHAM, in her official**
**Capacity as the Governor of New Mexico, the STATE**
**OF NEW MEXICO, HECTOR BALDERAS, in his official**
**Capacity as the Attorney General of the State of New Mexico,**
**and JEFF M. WITTE, in his official capacity as the**
**Director/Secretary of the New Mexico Department of**
**Agriculture and Cabinet Secretary of Agriculture for the**
**State of New Mexico,**

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

On May 3, 2021, Defendants Governor Michelle Lujan Grisham ("Governor"), the State of New Mexico ("State"), New Mexico Attorney General Hector Balderas ("Balderas"), and Jeff Witte ("Witte"), Director/Secretary of the New Mexico Department of Agriculture and Cabinet Secretary of Agriculture for the State of New Mexico, (collectively "Defendants") filed a *Motion and Memorandum in Support of Motion to Dismiss* (ECF No. 20), seeking to dismiss all claims in the case. The Court, having considered the motion to dismiss, briefs, pleadings, relevant law and otherwise being fully advised, has concerns about this Court's jurisdiction to proceed based on the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341. For the reasons given herein, the Court will reserve

ruling on the substantive merits of the motion to dismiss until the parties have an opportunity to address the jurisdictional issue.

## I. LEGAL STANDARD

On a motion to dismiss, the court generally assesses the legal sufficiency of the allegations contained within the four corners of the complaint. *Archuleta v. Wagner*, 523 F.3d 1278, 1281 (10th Cir. 2008). The court accepts as true all well-pleaded facts, viewing them in the light most favorable to the nonmoving party and allowing all reasonable inferences in favor of the nonmoving party. *Id.* at 1283. The court "should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011).

A federal court has an independent duty to determine whether it has subject-matter jurisdiction over the case, even in the absence of challenge from any party. *1mage Software, Inc. v. Reynolds and Reynolds Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006). A court may *sua sponte* raise the question of subject matter jurisdiction at any stage in the litigation. *Id.*

## II. BACKGROUND

### A. Senate Bill 57

All commercial feed, including dog and cat pet food, but excluding customer-formula feed, must be registered with the New Mexico Department of Agriculture (the "Department") before it can be distributed in New Mexico. *See* N.M. Stat. Ann. § 76-19A-2(F) & (P); § 76-19A-10(A). Pet food registrations must be accompanied by a $2.00 registration fee, and they expire each year on December 31st. N.M. Stat. Ann. § 76-19A-10(A).

Senate Bill 57 (2020) (hereinafter "SB57") created a new section to the New Mexico Commercial Feed Act (the "Act"), N.M. Stat. Ann. § 76-19A-1, entitled the Spay and Neuter

Program Fee. *See* N.M. Stat. Ann. § 76-19A-10.1, 2020 N.M. Laws Ch. 69 (S.B. 57). Effective July 1, 2020, SB 57 directed that the Department "shall collect an annual fee on each pet food registered with the department." *Id.* § 76-19A-10.1(A). The annual fee was $50.00 beginning January 1, 2021, raised to $75.00 on January 1, 2022, and will increase to $100.00 on and after January 1, 2023 (hereinafter the "Fee" or "Fees"). *Id.*[1]

The annual fee applies to each pet food label, subject to limited exceptions, that does not vary based on the amount of product distributed into or sold within New Mexico. (First Am. Compl. ¶¶ 45, 47, ECF No. 10.) A manufacturer thus may be required to register hundreds of separate labels with the Department annually. (*Id.* ¶ 46.) The Act contains exclusions for the Fees for veterinarian-prescribed diet pet food and for "pet food manufactured by a person who demonstrates to the board, in a manner prescribed by the board, that the person's tax-year annual gross revenue from the distribution of pet food is no more than three million dollars ($3,000,000)." N.M. Stat. Ann. § 76-19A-10.1(B)(1) & (2). Neither the Act nor the regulations define "tax-year annual gross revenue." (First Am. Compl. ¶ 54, ECF No. 10.)

The "fee collected" is distributed as follows: 96% is deposited with the state treasurer for "the statewide spay and neuter subaccount of the animal care and facility fund," and 4% is distributed to the Department to administer the Commercial Feed Act. N.M. Stat. Ann. § 76-19A-10.1(C). Money in the animal care and facility fund must be used to carry out the dog and cat spay and neuter assistance program and for reasonable administrative costs (not to exceed 5% of fees distributed to the subaccount). N.M. Stat. Ann. § 77-1B-4(D). The spay and neuter assistance program is limited to "individuals who have, or to nonprofit organizations that shall only provide assistance to service recipients who have, a household income that does not exceed" 200% of the

---

[1] The Spay and Neuter Program Fee has a delayed repeal provision effective July 1, 2026. *See* 2020 N.M. Laws Ch. 69 (SB57), Sec. 6.

current federal poverty level guidelines. N.M. Stat. Ann. § 61-14-7.1(B). SB57 delegates to the animal sheltering committee the duty to develop the criteria for the program and for qualifications for assistance. *See* N.M. Stat. Ann. § 61-14-7.1(A)-(B).

The Department may refuse or cancel a registration if the application or applicant fails to comply with the provisions of the Commercial Feed Act. *See* N.M. Stat. Ann. § 76-19A-10(C). The Act sets forth procedures for the Department to follow to withdraw from distribution or seize commercial feed that a distributor is distributing in violation of any provisions of the Act. *See id.* § 76-19A-13.

### B. The Parties

Plaintiff Pet Food Institute ("PFI") is a membership organization composed of and that gives voice to U.S. pet food manufacturers and is authorized to act on behalf of its members. (*See* First Am. Compl. ¶¶ 13-14, ECF No. 10.) Plaintiff New Mexico Chamber of Commerce ("NMCC"), a non-partisan member organization focused on business advocacy and economic development, is likewise authorized to act on behalf of its members. (*Id.* ¶¶ 17-18.) As a nationwide-industry trade group, Plaintiff Pet Industry Joint Advisory Council ("PIJAC") advocates for the broad pet care community and represents the interests of organizations within the responsible pet care community who manufacture, distribute, or sell pet food and pet treats. (*Id.* ¶ 23.) Plaintiffs PFI, NMCC, and PIJAC each have at least one member who is subject to the Fees and those members face the dilemma of paying the Fee or having their products removed from distribution or potentially seized. (*Id.* ¶¶ 14, 18, 24.) PFI, NMCC, and PIJAC each have at least one member who has paid the Fee for the 2021 registration year and one member who paid the 2021 Fee under protest. (*Id.* ¶¶ 15-16, 19-20, 24-25.)

Plaintiff New Mexico Farm and Livestock Bureau ("NMFLB") is a membership organization of farm and ranch families whose purpose is to analyze agricultural problems, seek solutions, and promote agricultural well-being in New Mexico. (*Id.* ¶ 21.) The NMFLB lobbied the Governor to veto SB57 due to its negative effect on its members that own pets and purchase pet food. (*Id.* ¶¶ 21-22.) Plaintiff Rio Grande Kennel Club ("RGKC"), an American Kennel Club member in New Mexico, is a nonprofit canine advocacy group whose members own pets that consume pet food and pet treats. (*Id.* ¶ 27.) RGKC requested that the Governor veto SB57 and it has at least one member that sells pet food and pet treats in New Mexico. (*Id.* ¶¶ 27-28.) Both the NMFLB and RGKC are troubled by the State's efforts to enact taxes disguised as fees on their members, and they are authorized to act on behalf of their members regarding the substantial public interests raised by this case. (*See id.* ¶¶ 22, 28.)

Plaintiffs brought this declaratory judgment action against Defendants to declare SB57 in violation of both the New Mexico and United States constitutions and the law of New Mexico. (First Am. Compl. 25, ¶¶ A-F, ECF No. 10). More specifically, Plaintiffs first seek a declaration that the Fee violates the Commerce Clause because it is not fairly apportioned, it discriminates against interstate commerce, and/or it is not fairly related to the services provided by the State. (*Id.* ¶ A.) Second, they request declarations that the Fee violates the Equal Protection Clause of both the United States and New Mexico constitutions. (*Id.* ¶¶ B-C.) Additionally, Plaintiffs ask the Court to declare that the Fee violates the New Mexico Anti-Donation Clause. (*Id.* ¶ D.) Next, Plaintiffs seek a declaration that the Fee is invalid under New Mexico law because it does not substantially relate to any services provided by the State and exceeds the amount reasonably necessary to cover administrative costs. (*See id.* ¶ E.) Finally, they ask the Court to declare the Fee

void for vagueness because, while labeled a Fee, it does not function as one, and because the Act does not clearly define which manufacturers will be subject to the $3 million exclusion. (*Id.* ¶ F.) According to Plaintiffs, the Governor, the State, the Attorney General, and the Secretary of Agriculture are proper entities to sue in a declaratory judgment action regarding the construction of state laws and the constitutions, relying in part on N.M. Stat. Ann. § 44-6-13. (*See* First Am. Compl. ¶¶ 30, 32, 34, 36, ECF No. 10.) In response, Defendants each contest that they are properly subject to suit.

This case is before the Court after removal by Defendants on the basis of federal question jurisdiction. (Notice of Removal 2, ECF No. 1.) Subsequently, Defendants moved to dismiss Plaintiffs' first amended complaint on six grounds: (1) the Governor is absolutely immune from suit because she acted in her legislative capacity; (2) Plaintiffs failed to state claims against Defendants because they did not allege conduct taken by the respective parties with respect to SB57; (3) the Fee is a fee, not a tax, and thus Plaintiffs fail to state a claim for violation of the Commerce Clause; (4) Plaintiffs' equal protection claim fails to state a claim because SB57 has a rational relationship to a legitimate State interest; (5) SB57 does not violate New Mexico's anti-donation clause as a matter of law; and (6) SB57 is not void for vagueness as a matter of law. (Defs.' Mot. to Dismiss 3, ECF No. 20.)

### III. ANALYSIS

Prior to determining the merits of the motion to dismiss, a question of jurisdiction was mentioned in the briefs that the Court must first address to determine whether it has authority to consider the merits of the case.

#### A. Jurisdiction

Plaintiffs, in a footnote in their response, assert that the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341, does not divest this Court of subject matter jurisdiction, even though they contend that the Fee is actually a tax. (Pl.'s Resp. 13-14 n.3, ECF No. 22.) Defendants did not address the impact of the TIA in their briefs or in their Notice of Removal. Although both parties appear to want to remain in federal court, this Court has an independent obligation to ensure that it has authority over the case. *See Hill v. Kemp*, 478 F.3d 1236, 1246-47 (10th Cir. 2007) ("the Supreme Court has gone so far as to hold that the TIA deprived it of jurisdiction even in cases where the defendant State argued in *favor* of federal court review").

The TIA states: "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The TIA prevents a federal court from entering a declaratory judgment holding a state tax law unconstitutional. *California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982). Whether a state-court remedy is "plain, speedy and efficient" depends on if it provides the taxpayer with a full hearing and judicial determination during which the taxpayer may raise any and all constitutional objections to the tax. *Id.* at 411.

Congress passed the TIA "to restrict 'the jurisdiction of the district courts of the United States over suits relating to the collection of State taxes.'" *Hibbs v. Winn*, 542 U.S. 88, 104 (2004) (quoting S. Rep. No. 1035, 75th Cong., 1st Sess., 1 (1937)). Congress sought to prevent taxpayers from avoiding paying their tax bill through use of a federal injunction that would disrupt state government finances. *See id.* at 104-05. The TIA applies in cases in which state taxpayers seek federal-court orders enabling them to avoid paying state taxes, which would have the effect of reducing the flow of state tax revenue. *See id.* at 106-07. The *Hibbs* Court explained the two objectives of the TIA: (1) to eliminate disparities between taxpayers who could seek injunctive

relief in federal court (usually based on diversity jurisdiction) and taxpayers who could only pursue relief in state courts, which generally required taxpayers to pay first and litigate later; and (2) to stop taxpayers from withholding large sums and disrupting state government finances. *Id.* at 104.

Plaintiffs argue that this Court has jurisdiction because (1) Plaintiffs chose to pay first and litigate later, and (2) labeling the tax a "fee" placed it outside the auspices of the Tax Administration Act, N.M. Stat. Ann. § 7-1-1 *et seq*. Turning to Plaintiffs' first argument that this Court has jurisdiction because Plaintiffs paid the Fee first and are contesting it after the fact, Plaintiffs rely on *Hibbs v. Winn*. In *Hibbs*, the Supreme Court explained that Congress, in enacting the TIA, "directed taxpayers to pursue refund suits instead of attempting to restrain collections." *Id.* at 104. The Supreme Court distinguished third-party suits that were not seeking to stop the collection or to contest the validity of a tax imposed on the plaintiffs from cases subject to the TIA. *Id.* at 104. The latter cases to which the TIA are directed are those where plaintiffs attempt "to avoid paying their tax bill by pursuing a challenge route *other than the one specified by the taxing authority*." *Id.* at 104-05 (emphasis added). Although Plaintiffs here chose to pay first, the Supreme Court indicated in *Hibbs* that the proper method Congress intended for taxpayers to pursue the right to the disputed sums is through a state refund action, not a separate federal action. *See id.* at 103 (explaining that TIA was modeled after earlier federal law that had two purposes, the second of which was to require the right to disputed sums be determined in a suit for refund). *See also Rosewell v. LaSalle Nat. Bank*, 450 U.S. 503, 522 (1981) ("The overall purpose of the Tax Injunction Act is consistent with the view that the 'plain, speedy and efficient remedy' exception to the Act's prohibition was only designed to require that the state remedy satisfy certain procedural criteria, and that Illinois' refund procedure meets such criteria."). The fact that Plaintiffs paid first,

does not establish that they have a right to litigate in federal court, rather than through the procedural avenue specified by the taxing authority.

Plaintiffs, however, assert a second argument for why the TIA does not divest this Court of subject matter jurisdiction. While they contend that the Fee is a tax for constitutional purposes under the Commerce Clause, they claim that it is not a "tax" under the TIA because the legislature labeled it a "Fee." In support of this argument, Plaintiffs rely on *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012) ("*N.F.I.B.*").

*N.F.I.B.* involved a challenge to the individual mandate in the Patient Protection and Affordable Care Act of 2010, 26 U.S.C. § 5000A, ("Affordable Care Act"), which requires individuals to buy a health insurance policy providing a minimum level of coverage. *Id.* at 530, 539. For individuals that do not comply with the mandate, they must make a "[s]hared responsibility payment" to the federal government, which is described as a "penalty," and is paid to the Internal Revenue Service with the person's taxes. *See id.* at 539. Before turning to the constitutionality of the individual mandate, the Supreme Court addressed whether it had the authority to so rule in light of the limitations imposed by the Anti-Injunction Act ("AIA"), which provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." *Id.* at 543 (quoting 26 U.S.C. § 7421(a)).[2] The Court noted that the AIA barred litigation to enjoin the collection of taxes, so that taxes generally may be challenged only after they are paid, by suing for a refund. *Id.* Because the lawsuit was brought before the mandate was enforceable and the Internal Revenue Code treated the penalty as a tax, the question for the Supreme Court was whether the Anti-Injunction Act barred the suit. *Id.*

---

[2] The TIA was modeled on the AIA, the latter of which concerns federal taxes. *Direct Marketing Ass'n v. Brohl*, 575 U.S. 1, 8 (2015).

Examining the text of the of the respective statutes, the Supreme Court found meaningful that the Affordable Care Act described the "[s]hared responsibility payment" as a "penalty," rather than a "tax," and the AIA applies only when the plaintiff attempts to restrain the collection of any "tax." *Id.* While noting that "Congress cannot change whether an exaction is a tax or a penalty for *constitutional* purposes simply by describing it as one or the other," the Supreme Court determined that Congress's decision to label the shared responsibility payment as a "penalty" rather than a "tax" was "significant" in determining whether a challenge to the penalty fell under the Anti-Injunction Act. *Id.* at 544. Congress cannot expand its power, for example, by labeling a punishment as a "tax," but the Supreme Court relied on the fact that both statutes were creatures of Congress's creation, and how they relate to one another is up to Congress. *Id.* The Supreme Court concluded that the AIA did not apply to the suit, because the Affordable Care Act did not require that the penalty for failing to comply with the individual mandate be treated as a tax. *Id.* at 546.

According to Plaintiffs, because the New Mexico legislature labeled the Spay & Neuter Fee a "fee," it treated it as a fee, not a tax, and following *N.F.I.B.*, the label is dispositive. *N.F.I.B.*, however, was based on the label given by Congress in two different statutes it created. We have a different situation here involving the construction of laws created by two different legislative entities. Here, Congress used the term "tax" in the TIA, but the New Mexico legislature used the term "fee." Moreover, *N.F.I.B.* was not a TIA case. Plaintiffs' footnote does not contain any analysis of the cases or explain why *N.F.I.B.* should apply in this context despite these noted differences.

The Court finds more on point the Tenth Circuit case *Hill v. Kemp*, 478 F.3d 1236 (2007). In *Hill*, the plaintiffs brought a First Amendment challenge to the constitutionality of Oklahoma's

statutory scheme for specialty motor vehicle license plates, which imposed an additional cost in addition to normal licensing charges. *See id.* at 1239-40, 1244. Prior to addressing the merits on the constitutional issues, the Tenth Circuit looked at whether the money paid to Oklahoma under its specialty licensing regime constituted a "tax" under the TIA that would preclude federal court jurisdiction. *See id.* at 1243-44.

It explained that to determine whether a charge or fee is a "tax" under the TIA, a court must first look at the TIA's plain terms. *Id.* at 1244. According to the Tenth Circuit, there were a couple meanings of "tax" at the time the TIA was enacted. *Id.* First, "tax" was defined at the time as an "enforced, usually proportional, contribution, esp. of money, levied on persons, income, land, commodities, etc., for the support of government and for the public needs; sometimes, a charge, as for a thing." *Id.* (quoting 3 *The New Century Dictionary of the English Language* 1949 (1927)). Another dictionary defined it as a "charge, esp. a pecuniary burden imposed by authority; specif., a charge or burden, usually pecuniary, laid upon persons or property for public purposes; a forced contribution of wealth to meet the public needs of a government." *Id.* (quoting *Webster's New International Dictionary of the English Language* 2587 (2d ed. 1934)). The *Hill* court concluded that, under either of the two definitions, the licensing regime involved taxes because the State was enforcing, through its power as a sovereign, a contribution of money levied on the distribution of a commodity and was plainly imposing a charge for a thing. *Id.*

The Tenth Circuit also found persuasive the way Judge Cooley distinguished between a tax and fee in his authoritative taxation treaty: "If revenue is the primary purpose, the imposition is a tax. Only those cases where regulation is the primary purpose can be specially referred to the police power." *Id.* & n.7 (quoting 1 Thomas M. Cooley, *The Law of Taxation* 99 (4th ed. 1924)). Where only $8 of each $35 plate sold went to the administration of the Oklahoma Registration

Act, and the remaining funds went to a variety of public purposes, the circuit court had "no qualms" finding that the primary purpose of the scheme was revenue, and thus, a tax. *Id.* at 1240, 1244-45.

Next examining its precedent, the Tenth Circuit identified certain characteristics that helped distinguish a regulatory fee incident to a State's police power and a "tax under State law" within the meaning of the TIA:

> [T]he classic tax sustains the essential flow of revenue to the government, while the classic fee is linked to some regulatory scheme. The classic tax is imposed by a state or municipal legislature, while the classic fee is imposed by an agency upon those it regulates. The classic tax is designed to provide a benefit for the entire community, while the classic fee is designed to help defray an agency's regulatory expenses.

*Id.* at 1245 (quoting *Marcus v. Kansas, Dep't of Revenue*, 170 F.3d 1305, 1311 (10th Cir. 1999)).

Here, the New Mexico legislature passed and set the Fees, not a regulatory body, weighing in favor of finding the Fee to be a tax. *Cf. Hill*, 478 F.3d at 1246 (explaining that Oklahoma Legislature created license plate assessment scheme and set fees by statutes, weighing in favor of holding the license plate assessments to be taxes). Second, most of the Fees collected raise revenue for public purposes rather than to cover administrative costs: 96% of the Fee is deposited with the state treasurer and credited to the statewide spay and neuter subaccount of the Animal Care and Facility Fund, while only 4% is distributed to the Department to administer the Commercial Feed Act. N.M. Stat. Ann. § 76-19A-10.1(C). The funds in the spay and neuter subaccount must be used to carry out spay and neuter services and for the reasonable costs of administering the Animal Sheltering Act, the reasonable costs of which shall not exceed 5% of the total fees distributed to the subaccount. *See* N.M. Stat. Ann. § 77-1B-4(D). Consequently, the dominant purpose of the Fees is not to defray the cost associated with administering the Commercial Feed Act as to pet food manufacturers and distributors. Only 4% of the funds are allocated for such regulatory expenses. Instead, the dominant purpose of the funds is to benefit the general public in reducing

the unwanted animal population, and more directly to benefit a subset of the general public – individual pet owners with household incomes that do not exceed 200% of federal poverty guidelines. *See* SB 57, sec. 1(B); Fiscal Impact Report, *Pet Food Fee for Neutering & Sheltering*, https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwjK8Ii44aj6AhXZF1kFHbhsA1AQFnoECAcQAQ&url=https%3A%2F%2Fwww.nmlegis.gov%2FSessions%2F20%2520Regular%2Ffirs%2FSB0057.PDF&usg=AOvVaw0rLgtNGpMDult8TLHTOMwb, at 3 (last visited Sept. 22, 2022). For the foregoing reasons, the Fees appear to qualify as "taxes under State law" within the meaning of the TIA. *Compare Hill*, 478 F.3d at 1245-46 (concluding that primary purpose of Oklahoma's specialty license plate scheme was to raise revenue, and thus was a tax, where majority of funds were to be disbursed for variety of public purposes); *with Marcus*, 170 F.3d at 1307, 1311-12 (concluding that assessment charged to disabled persons seeking disabled placard and identification card for special parking accommodations was regulatory fee where statute expressly tied monies collected to administration of motor vehicle registration laws and to covering costs of administering motor vehicle registration laws).

The question then is whether Plaintiffs have access to "a plain, speedy and efficient remedy" in New Mexico state courts. *See Hill*, 478 F.3d at 1253. The State meets these minimal criteria as long as it provides the taxpayer with adequate procedural due process that permits a taxpayer to raise constitutional objections to the tax. *Id.* Under SB57, when the Department believes a person has not complied with the New Mexico Commercial Feed Act, it may file a complaint for seizure in the district court in the judicial district where the commercial feed is located, and no commercial feed may be condemned until after a hearing in the district court. *See* N.M. Stat. Ann. § 76-19A-13(C)-(D). The department may also apply to the district court for an injunction restraining any person from violating the Act, and a person adversely affected by any

13

"act, order or ruling made pursuant to the provisions of the New Mexico Commercial Feed Act may appeal the decision as provided in Section 39-3-1.1 NMSA 1978." N.M. Stat. Ann. § 76-19A-14(A)-(B). Section 39-3-1.1 in turn sets forth the procedures for a person aggrieved by a final decision by an agency to appeal the decision to district court, which may set aside the decision for numerous reasons, including that the agency did not act in accordance with law. N.M. Stat. Ann. § 39-3-1.1(C)-(D). A party may further appeal to the court of appeals. *Id.* § 39-3-1.1(E). Consequently, based on these statutes, it appears that Plaintiffs have an adequate remedy to bring their constitutional challenges to the Fees in the New Mexico courts. *Cf. Landowners*, 822 F. App'x at 801 (concluding that Colorado provided plaintiff taxpayers with adequate remedy where taxpayers could appeal denial of tax credit and receive an administrative hearing, and they could further appeal negative ruling in state court, and from there, to state appellate courts).

"The party invoking federal jurisdiction has the burden to establish that it is proper." *Landowners United Advocacy Foundation, Inc. v. Cordova*, 822 F. App'x 797, 799 (10th Cir. July 31, 2020) (unpublished) (quoting *Baca v. Colo. Dep't of State*, 935 F.3d 887, 905 (10th Cir. 2019)). Based on the language of the TIA and on the record, the Court is not convinced that it has jurisdiction and will not herein proceed to a decision on the merits of the motion to dismiss. The Court, however, will give the parties an opportunity to address the jurisdictional issue since it has not been fully briefed. The parties should submit briefs, no more than 10 pages in length, on the issue of whether the TIA divests this Court of jurisdiction and whether remand is appropriate under the TIA. The parties should submit their respective briefs on or before October 21, 2022.

### B. Request for Status Conference

Defendants moved for a status conference in this case because of the age of the motion and to determine whether the litigation will move forward. The Court's busy criminal docket and trial

calendar caused the delay, but as the parties know from this Memorandum Opinion and Order, the Court is actively working on the motion and needs to first determine the jurisdictional issue before proceeding. Given these developments, the Court finds that a hearing is unnecessary at this time and will deny the motion. Should the Court feel a hearing is useful after examining the written briefs, it may reconsider.

**IT IS THEREFORE ORDERED** that

1. The parties must file briefs **on or before Friday, October 21, 2022**, of no more than 10 pages in length, addressing whether this Court lacks subject matter jurisdiction over this case under the Tax Injunction Act.

2. Defendants' *Request for Status Conference* (**ECF No. 30**) is **DENIED** without prejudice.

_____
SENIOR UNITED STATES DISTRICT JUDGE